## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re: Case No. A10-00465-DMD<br><br>SHAWN ANDREW RUDNICK<br>fdba Conquest Construction,<br><br>Debtor. | Chapter 7<br><br>**Filed On**<br>**8/22/11** |
| CATHY LOUGHLIN,<br><br>Plaintiff,<br><br>v.<br><br>SHAWN ANDREW RUDNICK,<br><br>Defendant. | Adversary No. A10-90021-DMD |

### MEMORANDUM DECISION

This is an action for exception to discharge for fraud. This court has jurisdiction under 11 U.S.C. § 1334(b) and the district court's order of reference. The action is a core proceeding in accordance with 11 U.S.C. § 157(b)(2)(I). I find for the plaintiff.

Background

In 2008, Cathy Loughlin ("Loughlin") desired to remodel her Anchorage home. She met with Shawn Rudnick d/b/a Conquest Construction ("Rudnick") to discuss the project. Rudnick had been recommended to Loughlin by the designer of her project. The parties visually inspected her property and discussed details of the remodel. Rudnick

submitted a bid of $95,700.00 on May 9, 2008.[1] After several subsequent communications, and believing Rudnick to be competent and fully licensed, Loughlin entered into a contract with Rudnick on May 14, 2008. Among other things, the contract called for Rudnick to add an addition to her home, construct a garage, and install a concrete patio and driveway.[2] As part of the new addition, Rudnick was to install and texture sheetrock, install new doors and windows, and demolish the existing kitchen and upgrade it with custom cabinets and countertops and new flooring.[3]

The contract required Rudnick to complete the work in a professional manner, furnish materials, and hire and pay subcontractors for the "cash price" of $94,775.00. The payment terms required a down payment of $47,387.50, an additional 25% once 50% of the work was completed, and the balance upon completion.[4] In addition, the contract provided for a one-year warranty on defective materials or installation.[5] On May 14, 2008, the date the parties signed the contract, Loughlin wrote a check to Conquest Construction for

---

[1] Pl.'s Ex. 27.

[2] Although it was not set forth in the contract, Rudnick was also to construct a shed on Loughlin's behalf. The shed was not mentioned in the written construction contract (Pl.'s Ex. 1). Loughlin paid $1,200 for a shed, however. *See* Pl.'s Ex. 29, at 11-12.

[3] Pl.'s Ex. 1.

[4] *Id.*

[5] *Id.*

$47,387.50 to begin the project.[6]  Loughlin paid Conquest Construction a total of $103,169.75.[7]

Alaska law establishes four categories of contractors: specialty, general (residential and limited residential), electrical and mechanical.[8]  General contractors who oversee the construction of a residential building or make alterations greater than 25% of the home's value must have a residential endorsement.[9]  To obtain such an endorsement, a general contractor must have passed an examination demonstrating competency in matters including arctic structural and thermal construction techniques, and satisfactorily completed a craftsman home program or a postsecondary course in arctic engineering.[10]

At the time the parties entered into the contract, Rudnick was advertising on the Internet as "a general contractor with over 19 years of experience . . . specializing in many phases of construction from building new to renovations."[11]  In fact, Rudnick was only

---

[6] Pl.'s Ex. 29.

[7] *Id*.

[8] *See* AS 08.18, *et seq*.

[9] AS 08.18.025 provides:

> A general contractor may not undertake the construction or alteration, or submit a bid to undertake the construction or alteration of a privately-owned residential structure of one to four units or advertise or publicly represent the general contractor may undertake work of this type in the state without a residential contractor endorsement issued under this section.  In this subsection, "alteration" means changes that have a value greater than 25 percent of the value of the structure being altered.

[10] AS 08.18.025(b).

[11] Pl.'s Ex. 47.

licensed to do rough carpentry, finish carpentry and painting by virtue of the specialty contractor's license he then held.[12] On June 19, 2008, Rudnick acquired a general contractor-limited residential license.[13] Because the endorsement was "limited," Rudnick was prohibited from overseeing new home construction and restricted to doing residential work less than or equal to 25% of the value of the structure being altered. In 2008, the assessed value of Loughlin's home was only $100,500.[14] In 2009, it was $147,900.[15]

      Rudnick performed work over the summer and fall of 2008 and received payments from Loughlin. Over the course of the 2008 winter and the following spring, problems with Loughlin's remodel became apparent. Cracks and heaves formed in the concrete patio, driveway and garage foundation. The heaves damaged trim and thresholds. Improperly graded concrete caused water to pool on the patio, which then seeped into the house and garage. Water dripped from misaligned gutters. The newly installed windows were cold and drafty. Water and debris fell into exposed kitchen drawers as a result of incorrectly installed countertops. The kitchen floor was uneven. Loughlin informed Rudnick of these problems within the one-year warranty period. He offered excuses, but refused to honor the warranty and correct many of the problems.

---

[12] Pl.'s Ex. 45.

[13] Pl.'s Ex. 46.

[14] Pl.'s Ex. 15 (Municipality of Anchorage Real Property Assessment).

[15] *Id.*

In May of 2009, Loughlin learned that the final electrical, plumbing and mechanical permits remained open and that, in effect, the project was not complete. On June 17, 2009, the Municipality conducted the final structural inspection. It failed: grading around the new addition lacked the proper slope to ensure drainage away from the foundation, exterior doors lacked a proper landing, the patio was improperly sloped, and the shed was improperly attached to the house because it lacked a foundation or engineered pad.[16] Rudnick refused to repair the patio and the foundation and correct the grading around the house.

Concerned about water seeping into her home and garage from the improperly graded patio, on July 30, 2009 Loughlin paid Custom Concrete $7,600.00 to remove and replace the driveway and patio concrete.[17] On February 9, 2010, at Loughlin's request, Taylored Restoration inspected the work performed by Rudnick and estimated the cost to remedy other items that Rudnick refused to repair to be $36,734.78.[18]

Loughlin contacted the Municipality of Anchorage's occupational licensing division to inquire about Rudnick's licensing. She was subsequently informed that he was not properly licensed for the scope of her project. After conducting an investigation, on or about August 8, 2009, the State of Alaska, Department of Labor and Workforce Development, issued a Cease and Desist Order against Mr. Rudnick and imposed a $1,000

---

[16] Pl.'s Ex. 34.

[17] Pl.'s Ex. 20.

[18] Pl.'s Ex. 19.

fine.[19] According to the Notice of Administrative Fine, Rudnick violated AS 08.18.025 by working without a residential endorsement when he "contracted with Ms. Cathy Loughlin to remodel her home. The appraised value of the home being $204,700. The scope of the work provided by Mr. Rudnick of Conquest Construction exceeded the 25% allowed by law for contractors [without] a residential endorsement."[20]

On June 2, 2010, Rudnick sought chapter 7 relief.[21] Several days later, he amended his Schedule F to add a $93,000.00 business debt to Cathy Loughlin.[22] He did not characterize the debt as contingent, unliquidated or disputed.[23] On August 29, 2010, Loughlin filed a timely action to except her debt from discharge under 11 U.S.C. § 523(a)(2)(A).

---

[19] Pl's Ex. 17.

[20] Pl.'s Ex. 16. The appraised value stated in the notice was the "total assessed value" of Loughlin's land and building pursuant to the Municipality of Anchorage's 2009 Real Property Assessment. The land was valued at $56,800, the building was valued at $147,900.

[21] *See In re Rudnick*, Main Case No. 10-00465, Ch. 7 Petition, filed June 2, 2010 (Docket No. 1).

[22] *In re Rudnick*, Main Case No. 10-00465, Amended Schedule F, filed July 8, 2010 (Docket No. 17).

[23] *Id*.

-6-

Analysis

11 U.S.C. § 523(a)(2)(A) excepts from discharge debts for money, property or services which were obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[24]

To establish a claim for fraud, a creditor must show five elements:

> (1) the debtor made . . . representations;
>
> (2) that at the time he knew they were false;
>
> (3) that he made them with the intention and purpose of deceiving the creditor;
>
> (4) that the creditor relied on such representations; [and]
>
> (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.[25]

"False representations are representations knowingly and fraudulently made that give rise to the debt. False pretenses . . . involve an implied misrepresentation that is meant to create and foster a false impression."[26]

---

[24] 11 U.S.C. § 523(a)(2)(A).

[25] *Ghomeshi v. Yehuda Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010) (citations omitted).

[26] *Cabrera v. Larranaga (In re Larranaga)*, No. 09-1158 J, 2011 WL 1344562, at *4 (Bankr. D.N.M Apr. 8, 2011) (footnotes omitted); *see also Carlan v. Dover (In Re Dover)*, 185 B.R. 85, 88 n.3 (Bankr. N.D. Ga. 1995) (false representation is said to have occurred where defendant has made expressed, rather than implied, misrepresentation); *Hile v. Lewis (In re Lewis)*, 164 B.R. 588, 591 (Bankr. N.D. Ohio 1994).

A creditor's reliance on the debtor's representations must be justifiable.[27] The plaintiff must prove the elements of its exception to discharge claim by a preponderance of the evidence.[28]

The question is whether Rudnick represented to Loughlin that he was properly licensed to do her remodel. The testimony at trial was contradictory. Loughlin testified that Rudnick told her from the start that he was a general contractor with extensive construction and remodeling experience. He told her he had built apartment buildings and stressed that he was called in to fix problems caused by other contractors. He told Loughlin that all of his customers were satisfied with his work. When they met to discuss the project, Rudnick reiterated his qualifications, experience, and ability to do the work.

Rudnick testified that he told Loughlin before the contract was signed that he was a specialty contractor and that he was working to get the paperwork for his general contractor's license processed. In rebuttal, Loughlin claimed never to have heard the term "speciality contractor" until these proceedings. Further, she testified that she would never have hired anyone who was not properly licensed to do a job of such magnitude. Licensing was important to Loughlin. As a licensed mental health clinician, she understood licensing to be an assurance of competence and training.

Loughlin's testimony was more credible. The evidence presented at trial showed that Rudnick made inconsistent statements about his contractor status on Loughlin's

---

[27] *Field v. Mans*, 516 U.S. 59, 74-75 (1995).

[28] *Grogan v. Garner,* 498 U.S. 279, 291 (1991).

project, claiming in one instance to be the general contractor and in another to be only a subcontractor. In addition, at the time the parties signed the contract Rudnick was advertising on the Internet as a general contractor.[29] Rudnick did not obtain a general contractor's license until June 19, 2008, however, over one month after the parties signed the contract.[30] The general contractor's license he obtained only contained a "limited residential" endorsement. It prohibited him from doing an extensive remodel such as Loughlin's. Rudnick's testimony that he would be in compliance with the registration requirements if he himself did no more than 25% of the work and subcontracted the rest demonstrates that he knew he was restricted. The cease and desist order issued by the State, however, confirms that Rudnick did not limit his work on Loughlin's home to 25% of its value. Just as Rudnick exceeded the scope of his general contractor-limited residential license, he similarly exceeded the scope of his specialty contractor's license by doing the concrete work on Loughlin's project. In short, at the time the parties entered into the contract, Rudnick was deceiving not only Loughlin but the general public as well by representing himself to be a general contractor.

>"The general purpose of the [contractor license] law is to guard the public against the consequences of incompetent workmanship, imposition and deception."[31] Alaska

---

[29] Pl.'s Ex. 47.

[30] Pl.'s Ex. 46.

[31] *Alaska Nat'l Ins. Co. v. Northwest Cedar Structures, Inc.*, 153 P.3d 336, 341 n.25 (Alaska 2007), *quoting Asdourian v. Araj*, 696 P.2d 95, 98 (Cal. 1985).

law prohibits a general contractor from (1) undertaking the construction or alteration of a residential structure, (2) submitting a bid to undertake such work, and (3) advertising or publicly representing that such work may be undertaken, without a residential endorsement.[32] At the time the parties entered into the contract, Rudnick possessed neither a residential endorsement nor a limited residential endorsement. The evidence demonstrated that Rudnick held himself out to Loughlin as a general contractor. His testimony that he advised Loughlin during their preliminary discussions that he was working to get his general contractor's license, even if true, is irrelevant.[33] Other courts have excepted debts from discharge based on a debtor contractor's misrepresentations as to his licensing status.[34] Based on the evidence presented here, I conclude that Rudnick falsely represented to Loughlin that he was properly licensed to undertake the project. I further conclude that at the time Rudnick made the representation he knew that it was false.

---

[32] AS 08.18.025(a).

[33] In his closing argument at trial, debtor's counsel argued that because Rudnick's application for a general contractor's license was being processed at the time of the parties' preliminary discussions, the doctrine of substantial compliance relieves Rudnick of liability for intentional misrepresentation. AS 08.18.151 requires a contractor to have been properly registered at the time of contracting in order to bring an action for breach of contract. Under the doctrine of substantial compliance, a contractor who has substantially complied with the registration requirements may bring such an action despite his license having expired *after* the contract was entered into. *See Brandner v. Agre*, 80 P.3d 691 (Alaska 2003). The doctrine does not apply to cases where, as here, the contractor was not properly licensed at the time of the contract's formation and the contractor is not seeking compensation for work performed under the contract.

[34] *In re Grenier*, No. 07-1131, 2009 WL 763352, at *9 (Bankr. D. Mass. Mar. 19, 2009) ("[W]hen a contractor positively misstates that he has the requisite license to perform home repairs, the false statement is a misrepresentation as a contractor has a duty to disclose his lack of a license during negotiations."). *McCain v. Fuselier (In re Fuselier)*, 211 B.R. 540, 544, *citing Peterson v. Bozzano (In re Bozzano)*, 173 B.R. 990, 994-95 (Bankr. M.D.N.C. 1994) ("[L]icensing touches on the essence of the construction transaction[;] . . . the contractor/debtor has the affirmative duty to disclose his lack of a contractor's license.").

The question then becomes: did Rudnick make the representation with the intent and purpose of deceiving the plaintiff. "[F]raudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct."[35] "Intent to deceive can be inferred from surrounding circumstances."[36] Rudnick held himself out as a general contractor. By doing so, he fostered the misimpression that he had the skills and training required of licensed general contractors. Possessing only a specialty contractor's license, he entered into a contract with Loughlin, promising to perform a remodeling project worth nearly $95,000.00 on a home that had been appraised in 2008 at $100,500.00. Even after he acquired his general contractor's license, more than a month after the contract was signed, he was not fully licensed to do all of the work he contracted to do because of the limited residential endorsement. His own testimony confirms he was fully aware of the restrictive nature of the license. Rudnick's work was inadequate. When Loughlin timely complained of problems, defects, and shoddy workmanship, Rudnick refused to honor his warranty. Finally, the State stepped in and issued a cease and desist order. "[T]he totality of the circumstances paints a picture of deceptive conduct by the debtor that indicates an

---

[35] *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir. 1985); *McCrary v. Barack (In re Barrack)*, 217 B.R. 598, 607 (B.A.P. 9th Cir. 1998).

[36] *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1018 (9th Cir. 1997) (citations omitted). *See also Nahman v. Jacks (In re Jacks)*, 266 B.R. 728, 742 (B.A.P. 9th Cir. 2001), *quoting Household Credit Servs. v. Ettell (In re Ettell),* 188 F. 3d 1141, 1145 n.3 (9th Cir. 1999) ("Because no single objective factor is dispositive, assessment of intent is . . . left to the fact-finder.")*; Washington v. Hultquist (In re Hultquist)*, 101 B.R. 180, 183-84 (B.A.P. 9th Cir. 1989) (intent can be inferred and established from surrounding circumstances).

intent to deceive the creditor."[37] I therefore conclude that Rudnick made the representation with the intent and purpose of deceiving Loughlin.

Under the circumstances, Loughlin justifiably relied on Rudnick's representations. Loughlin's experience with remodels was limited. She testified that in the past she had replaced a roof for around $2,000.00 and installed an $1,800.00 asphalt driveway. Those projects were nowhere near the magnitude of this $94,000+ remodel. She asked her project designer for some names of contractors and he recommended Rudnick. As noted, licensing was important to Loughlin. She looked into Rudnick's licensing and discovered that he had a contractor's license. Given her relative lack of experience, however, Loughlin did not know that the type of license he possessed "had meaning." Loughlin was not capable of appreciating the results of her investigation. In any event, the law does not require her to investigate.[38]

Significantly, Rudnick said nothing to disabuse Loughlin of her belief that he was properly licensed, and therefore competent, to do the work. In fact, Rudnick was not competent. According to credible testimony presented at trial, Rudnick failed to properly prepare the ground beneath the patio and driveway before pouring the concrete, which led to excessive heaving and cracking. The windows Rudnick installed lack insulation and

---

[37] *Stein v. Tripp (In re Tripp)*, 357 B.R. 544, 549 (Bankr. D. Ariz. 2006).

[38] "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." Restatement (Second) of Torts § 540. *See also Diamond v. Kolcum*, 285 F.3d 822, 827 (9th Cir. 2002) (bankruptcy law does not require investigation of factual representations to demonstrate justifiable reliance).

-12-

sealant and must be replaced. Ceiling drywall was done below standards and must be scraped, floated and textured. The product used by Rudnick to level the kitchen floor was improperly applied, resulting in a wavy, uneven floor. The shed presented additional problems. Loughlin objected to the shed Rudnick built because it was not built according to her specifications. Rudnick hauled it off, and built a second shed. It had to be removed because Rudnick attached it to the house in violation of applicable building codes.

As a result of her justifiable reliance on Rudnick's representations, Loughlin paid Rudnick $103,169.75. The workmanship was defective, and Loughlin sustained damages. Loughlin prays for damages of $93,000.00. This sum is based on the scheduled amount of her claim listed by Rudnick on his Schedule F.

"In actions based on misrepresentation, [however,] damages must be established with reasonable certainty. They may not be speculative or contingent."[39] Loughlin's damages consist of the sums she has paid, or will pay, to repair Rudnick's inadequate work. On July 30, 2009, Loughlin paid Custom Concrete $7,600.00 to demolish and replace the defective patio and driveway.[40] In November 2009, she paid Rudnick $1,200.00 to build a replacement shed. Taylored Restoration estimated the cost to remedy additional defective workmanship to be $36,734.78.[41] Credible trial testimony also

---

[39] *Alaska Ins. Co. v. Movin' On Constr., Inc.*, 718 P.2d 472, 474 (Alaska 1986).

[40] Pl.'s Ex. 20. Rudnick testified at his deposition that this was a reasonable amount. *See* Pl.'s Ex. 26, at 58.

[41] Pl.'s Ex. 19 (Taylored Restoration's February 2010 estimate).

-13-

established that the cost to repair the kitchen floor will be approximately $4,000.00. These items total $49,534.78, and this sum is her measure of damages. Loughlin did not establish any other pecuniary damages.

Loughlin also seeks an award of costs and attorney's fees.[42] She is entitled to attorney's fees as provided under the contract[43] and her costs of suit.[44] Loughlin is further awarded prejudgment interest. In a nondischargeability action, an award of prejudgment interest is governed by state law.[45] "The purpose of awarding prejudgment interest is that money is worth less the later it is received. Therefore, "in order to make a plaintiff whole, prejudgment interest is necessary to compensate plaintiff for the loss of the use of the money from the date of injury until the date of judgment."[46] Under Alaska law, "in contract cases, prejudgment interest runs from the date the claim accrues, unless that would result in an injustice."[47] Here, absent an award of prejudgment interest, Loughlin would not be adequately compensated for her loss. Prejudgment interest will be awarded at the legal rate of 3.75% as provided in AS 09.30.070(a), and will accrue from the date Loughlin's state

---

[42] Pl.'s Compl., filed Aug. 29, 2010 (Docket No. 1), at 6.

[43] *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007).

[44] 28 U.S.C. § 1920.

[45] *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1463 (9th Cir. 1997).

[46] *American Nat'l Watermattress Corp. v. Manville*, 642 P.2d 1330, 1343 (Alaska 1982) (citations omitted).

[47] *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 724 (Alaska 2003); *see also Alderman v. Iditarod Prop., Inc.*, 104 P.3d 136, 145 (Alaska 2004).

court complaint was filed, June 24, 2010.[48]  Post-judgment interest will accrue at the federal judgment rate provided for under 28 U.S.C. § 1961(a).

Conclusion

Rudnick made a fraudulent representation that damaged Loughlin.  Loughlin suffered damages in the sum of $49,534.78.  This sum will be excepted from discharge under 11 U.S.C. § 523(a)(2)(A).  Loughlin is also awarded pre- and post-judgment interest, plus her costs and attorney's fees.  A final judgment will be entered after the amount of attorney's fees has been determined.

DATED:  August 22, 2011.

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:     S. Ching, Esq. (for plaintiff)
           C. Johansen, Esq. (for defendant)

           08/22/11

---

[48] Her claim may have accrued earlier, but I have not been given enough evidence to specify a particular date.  Arguably, the claim could have accrued as early as February 9, 2010, the date of the Taylored Restoration repair estimate.